UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| JOSEPH W. SULLIVAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:21-CV-153-CEA-JEM |
| | ) |
| GARRETT LEE PEGG and | ) |
| CALEB MITCHELL GRIFFIN, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Defendants' Joint Motion to Exclude the Testimony of Tyler Kress [Doc. 41]. Plaintiff responded in opposition [Doc. 47]. Defendants filed a reply but did not do so until after the time for a reply had lapsed [Doc. 51]. *See* E.D. Tenn. L.R. 7.1(a). The Court, nonetheless, has considered the reply. For the reasons explained below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion [**Doc. 41**].

I.   BACKGROUND

This lawsuit arises out of two motor vehicle accidents involving Plaintiff Joseph W. Sullivan, Defendant Garrett Lee Pegg, and Defendant Caleb Mitchell Griffin on May 2, 2020, on Calderwood Highway, which is also known as the Tail of the Dragon [Doc. 1 ¶ 1]. Plaintiff alleges that the first crash was a head-on collision with a motorcycle driven by a third-party, which occurred when Defendant Pegg failed to maintain control of his vehicle and passed over into the lane of oncoming traffic, hitting the motorcycle [*Id.*]. The second crash occurred when one of Defendant Pegg's friends who witnessed the collision, Defendant Griffin, walked from the scene

of the first crash and tried to warn other drivers of the crash [*Id.*]. He was standing in the lane of oncoming traffic [*Id.*]. Plaintiff drove around a curve nearby in the lane in which Defendant Griffin was standing [*Id.*]. Plaintiff alleges he had to swerve to avoid injuring Defendant Griffin and his motorcycle skid and crashed, causing Plaintiff injuries [*Id.*].

Plaintiff has disclosed Tyler Kress, Ph.D., as an engineering, accident reconstruction, and human factors expert [Doc. 47 p. 3]. Plaintiff asserts that Dr. Kress will "assist the jury in understanding, among other things, the conditions of this road and it's numerous curves, human factors relevant to operating motorcycles, the limited sight-distance and time for Mr. Sullivan to respond to Mr. Griffin, and how the Defendants' actions more likely than not caused or contributed to the subject incident and Mr. Sullivan's resulting injuries" [*Id.* at 3–4]. In his July 2, 2022 report, Dr. Kress makes seven findings and opinions:

1. Mr. Griffin testified that his best estimate of time between Mr. Pegg's accident and Mr. Sullivan's was about an hour, and testified it felt like it was a few hours or a couple hours. The 911 audio records indicate that Mr. Griffin's testimony is markedly incorrect, and that the time between was just a few minutes; the Tennessee Traffic Crash Reports for both incidents also reveal that the times of the two crashes were just a few minutes apart.

2. Mr. Griffin estimated that when Mr. Sullivan came around a curve the distance available for Mr. Sullivan to see him was about 70 yards. Although Mr. Griffin believes Mr. Sullivan made eye contact with him at that point (i.e.[,] when he was ~70 yards away), Mr. Sullivan's testimony indicates that he likely did not make eye contact at that moment due to the location of Mr. Griffin and the geometry of the roadway. My measurements did indicate that there is only about 60 to 70 yards available, site-distance-wise, around the curvature of the roadway, however Mr. Sullivan would not have likely been looking straight at Mr. Sullivan in operating his motorcycle when he was that distance away. The distance and available to respond via steering and/or braking for Mr. Sullivan from the initiation of a response would more likely be on the order of 40 or 50 yards at most (that is assuming that Mr. Sullivan actually does see Mr. Griffin when he is 60 to 65 yards away).

2

3. The American Association of State Highway and Transportation Officials (AASHTO) provides guidance in roadway design and warning signage associated with curves ahead and the need to slow down for upcoming roadway characteristics or potential hazards. AASHTO's policy includes a vehicle operator's perception-identification-emotion-volition (PIEV) time that accounts for the durations which drivers watch, recognize, and react to step on the brake for avoiding objects on the roads. The PIEV design time for highway alignment is 2.5 seconds and if Mr. Sullivan was traveling 35 mph, 2.5 seconds would amount to approximately 40 yards design travel distance before he first applies his brake. If Mr. Sullivan first saw/perceived Mr. Griffin when he was 60-70 yards away, then using the AASHTO PIEV time would leave 20 to 30 yards between Mr. Sullivan and where Mr. Griffin was, when Mr. Sullivan would first apply his brake at the presumed speed of 35 mph and then have to decide what to do with respect to steering and where to potentially move off the roadway. From a human factors engineering perspective, Mr. Sullivan's perception that Mr. Griffin needed assistance and his decision to pull off the roadway travel lane where he did were reasonable.

4. Mr. Griffin said that right after Mr. Sullivan's accident Mr. Sullivan told him that he thought he needed help and as a result he pulled over and lost control of his motorcycle. The pull-off area has gravel and surface conditions more conducive to a motorcycle laying over than the roadway travel lane does. Mr. Sullivan would not have steered off of the roadway into the pull-off area had the first collision not occurred. Similarly, Mr. Sullivan would not have steered off of the roadway into the pull-off area had Mr. Griffin not been doing what he was doing. Hence, Mr. Sullivan would not have had his traffic accident but for the first accident ahead of him, and but for Mr. Griffin's actions as a result of that first accident.

5. Mr. Griffin testified that traffic had backed up behind the first collision such that the last vehicle that was stopped closest to where he was standing was about 20 yards away. He estimated that the distance from that last car to the first collision was about 30-40 yards. Therefore Mr. Griffin indicated that he was standing about 50 to 60 yards from the first collision. These estimates are definitely most consistent with Mr. Griffin standing around the back side of the blind curve that Mr. Sullivan traversed and subsequently had his accident. In other words, Mr. Griffin's estimates are more consistent with Mr. Griffin standing in the roadway (or off the roadway) towards the more easternmost vicinity of the paved pull-off; the distance from the easternmost vicinity of the pull-off to the first collision is about 120 to 130 yards which is closer to Mr. Griffin's estimate of 50 to 60 yards as opposed to approximately 160 to 170

3

        yards from the first collision to the westernmost vicinity of the pull-off.

6. Mr. Griffin testified that he was standing in the paved pull-off area and not in the roadway travel lane although Mr. Sullivan testified that Mr. Griffin was standing over the white fog line in the roadway travel lane. Mr. Griffin testified that he was standing at a location before the blind curve as opposed to being around the back side of it more. Mr. Sullivan indicated Mr. Griffin was further around the curve. The paved pull-off area literally spans the horizontal apex of the subject curve. Regardless of whether Mr. Griffin was more towards the front/western (or north) portion of the paved pull-off area (relative to Mr. Sullivan's west-to-east or southward travel direction) or more towards the rear or eastern (or south) half of it, and regardless of whether Mr. Griffin was standing off the road or in the road over the fog line, if Mr. Griffin was in the area of the curve where the pulloff spans, then providing hand gestures or warnings associated with traversing that curve (or associated with a hazard that is at the exit of the curve or soon past the curve as Mr. Griffin indicates) is not enough of an advance notice before the curve for motorists who may need to respond and/or maneuver through a warned condition. AASHTO, for example, indicates that warning signage such as (but not limited to) Stop Ahead and Yield Ahead should be minimally placed a distance of 75 to 125 feet in advance of a curve if the speed limit is 30 or 35 miles per hour respectively. As a result of the first accident, and Mr. Griffin's action of standing where he was and gesturing, limited time was provided to, and available for, Mr. Sullivan to perceive and understand a potential hazard that he may be encountering, and to make and execute a decision accordingly.

7. In summary, the first collision was a proximate cause of Mr. Sullivan's accident. Mr. Griffin was standing and gesturing to road users only because of the first collision. Also, had Mr. Griffin not been gesturing at that location as described, Mr. Sullivan would have more-likely-than-not been able to come to a controlled stop in his lane in the roadway without his motorcycle laying over.

[Doc. 41-1 pp. 7–9].

      Defendants deposed Dr. Kress on January 12, 2023 [Doc. 41 p. 4]. As explained in detail below, they now challenge each of Dr. Kress's opinions. They do not, however, argue that Dr. Kress is unqualified as an expert to testify in this case [*See* Doc. 47 p. 6].

Plaintiff generally asserts that "Dr. Kress's opinions are well-supported by facts and information in the record, and he has reached those opinions in a reliable manner by applying the knowledge, training and experience he acquired in his fields" and that "[h]is testimony will assist the trier of fact to understand the evidence and determine facts at issue in this case" [*Id*. at 9]. Specifically, Plaintiff asserts that (1) "in forming his opinions, Dr. Kress has relied on a variety of sources and information in the record and made available to him in accordance with Federal Rule of Evidence 703"; (2) "Defendants ignore that experts are expressly permitted to assume facts so long as they are supported by the record and may answer hypotheticals based on assumed facts"; (3) "Dr. Kress's testimony is relevant and will assist the trier of fact in understanding the evidence"; and (4) "to the extent the Defendants disagree with any of Dr. Kress's conclusions, believe he should have done more investigation or testing, or dispute the bases for his opinions, this goes to the weight of his testimony and is not a basis for his exclusion" [*Id.* at 7–9].

## II.    STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharmas.*, *Inc.*, 509 U.S. 579, 589 (1993)). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

5

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court of the United States stated in *Daubert* that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. This standard "attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009).

The factors relevant in evaluating the reliability of the testimony include: "whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970–71 (M.D. Tenn. 2002) (citing *Daubert*, 509 U.S. at 593–94). The inquiry is "a flexible one," and these factors do not constitute a definitive checklist or test. *Kumho Tire Co.*, 526 U.S. at 138–39 (citing *Daubert*, 509 U.S. at 593); *see also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999) (explaining that these factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted").

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cnty.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138–39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the

case." *Coffey*, 187 F. Supp. 2d at 70–71 (quoting *Daubert*, 509 U.S. at 593–94). The party offering the expert has the burden of proving admissibility. *Daubert*, 509 U.S. at 592 n.10.

The court will not "exclude expert testimony merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (quotation marks and citations omitted). Exclusion is the exception, not the rule, and "the gatekeeping function established by *Daubert* was never 'intended to serve as a replacement for the adversary system.'" *Daniels v. Erie Ins. Grp.*, 291 F. Supp. 3d 835, 840 (M.D. Tenn. Dec. 4, 2017) (quoting *Rose v. Matrixx Initiatives, Inc.*, No. 07–2404–JPM/tmp, 2009 WL 902311, at *7 (W.D. Tenn. Mar. 31, 2009)) (other quotations omitted). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Rule 702 does not "require anything approaching absolute certainty." *Daniels*, 291 F. Supp. 3d at 840 (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010)).

District courts generally have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 375 (quoting *Kumho Tire*, 526 U.S. at 152). Decisions by the district court are thus reviewed for an abuse of discretion. *See id.* (citing *Nelson v. Tenn. Gas Pipeline Co.*, 234 F.3d 244, 248 (6th Cir. 2001). "This deferential standard makes sense because *Daubert* establishes a 'flexible' test that considers many indicia of reliability[,]" and relevance will depend "on the particular science and the particular scientist before the court." *Id.* (citing *Kumho Tire*, 526 U.S. at 150).

### III. ANALYSIS

Defendants challenge each of Dr. Kress's seven opinions. While the Court finds Dr. Kress may not testify as to proximate cause because it is a legal conclusion, Defendants can present their challenges to Dr. Kress's opinions through cross-examination.

7

### A. Opinion Nos. 1, 3, & 6

***Opinion One.***  In his first opinion, Dr. Kress opines that the first collision involving Defendant Pegg was close in time to when Plaintiff's incident occurred [Doc. 41-1 p. 7]. Defendants assert that this opinion "clearly fails the principles under F.R.E. 702 and the *Daubert* principles as his testimony and knowledge will not assist the trier of fact, is not based upon sufficient facts or data, is unreliable, and unreliably applied" [Doc. 41 p. 6]. In addition, Defendants assert Dr. Kress's opinion will confuse the jury and leave them to speculate on assumptions made by Dr. Kress that "are clearly incorrect" [*Id.*]. In support, Defendants acknowledge that Dr. Kress relied upon the traffic crash reports and reviewed and analyzed audio recordings, but they assert his opinion is not reliable because he did not speak to the officers or dispatchers, assumed the Blount County Police Radio was a complete record without breaks, and did not conduct any research to determine whether a call could be made from the accident scene [*Id.* at 5]. Defendants further assert this information is unreliable for a variety of reasons [Doc. 51 pp. 3–4].

Plaintiff counters that Dr. Kress relied upon several materials that are commonly relied upon by experts in his fields, including crash reports from both incidents, the 911 call, the Blount County Emergency Communications Call Detail Report, and the Emergency Communication radio communications, which were made contemporaneously or shortly after the incidents, to reasonably render his first opinion [Doc. 47 pp. 10–11]. To the extent Defendants criticize Dr. Kress for not having a complete record and for not clarifying discrepancies, including Defendant Griffin's statement about the time between the two incidents, Plaintiff argues that these matters go to the weight that should be given to Dr. Kress's testimony, not its admissibility [*Id.* at 12].

***Opinions Three and Six.***  In opinion three, Dr. Kress opines that Plaintiff's perceptions and actions in pulling his motorcycle off the roadway were reasonable [Doc. 41-1 p. 7]. In opinion

six, he opines that, considering the road curvature and limited sight distances, where Defendant Griffin was standing in the curve did not provide adequate notice to Plaintiff to respond and safely maneuver to avoid a potential hazard [*Id.* at 8–9].

Defendants take issue with Dr. Kress's reliance on the American Association of State Highway and Transportation Officials (AASHTO) guidance in forming these opinions [Doc. 41 p. 7]. According to Defendants, Dr. Kress used the AASHTO guidance, which provides recommended practices and guidelines for designing and constructing highways and associated signage, to show a vehicle operator's perception, identification, emotion, and volition (PIEV) time [*Id.*]. Defendants assert there is no dispute in this case related to road design or signage, and Dr. Kress does not provide any study, citation or reference that the PIEV was used in the context of warning an oncoming motorist, nor that the AASHTO guidance is to be followed by drivers in Tennessee [*Id.* at 7–8]. Further, Defendants argue that Dr. Kress is placing the standards for roadway construction and signage upon Defendant Griffin [*Id.* at 10; Doc. 51 pp. 5–6].

Plaintiff counters that Dr. Kress applies his research and "AASHTO's estimated 2.5 seconds of perception and reaction time[] to determine that if Mr. Sullivan first saw Mr. Griffin when he was 60-70 yards away from him, then Mr. Sullivan had approximately 40 yards of travel distance before he could perceive and react (based on the 2.5 second delay in reaction time) leaving him approximately 20-30 yards to apply his brake and/or decide how to respond to seeing Mr. Griffin in the roadway" [Doc. 47 pp. 19–20]. According to Dr. Kress, this was not enough time to safely respond [*Id*. at 20]. Plaintiff argues that Defendants ignore why AASHTO's use of P-I-E-V in roadway design is relevant here; he says it is relevant because "[i]t is a human factors value in the sense that it is associated with designing roadways and doing certain actions in basing signage and basing warnings and basing geometry in locations based on what – what should be afforded to humans" [*Id.* at 20 (citing Exh. C at 93:19–94:6) (cleaned up)]. Nor have Defendants

9

shown, Plaintiff asserts, that the AASHTO principles and perception and reaction times would be any different under the circumstances of this case [*Id*. at 20–21].

      ***Analysis.*** Upon review, the Court finds that Defendants' assertions related to Dr. Kress's first, third, and sixth opinions go to the weight of his testimony, not admissibility. *See Wilson v. Summit TreeStands, Inc.*, No. 1:18-cv-294, 2021 WL 5281601, at *4–5 (E.D. Tenn. Mar. 19, 2021) (denying motion to exclude where challenge was to the conclusion of expert, not reliability); *see also In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 45 F. Supp. 3d 724, 755 (N.D. Ohio 2014) ("To the extent that Whirlpool's experts disagree with Van Audenrode's methodology, these disagreements 'bear on the weight of the evidence rather than on its admissibility' and can be explored through cross examination and refuted with competing expert testimony." (citation omitted)). Defendants can address all of their concerns about the reliability of Dr. Kress's first, third, and sixth opinions through vigorous cross-examination and presentation of contrary evidence. *McClean v. Ontario LTD.*, 224 F.3d 797, 801 (6th Cir. 2000) ("[M]ere 'weakness in the factual basis of an expert witness's opinion bear[s] on the weight of that evidence rather than its admissibility.'" (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993))); *see also Daubert*, 509 U.S. at 596 (stating that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are still available). And Defendants do not show that Dr. Kress's opinions are "so fundamentally unsupported that [they] can offer no assistance to the [trier of fact]." *See Hartley v. Dillard's, Inc.*, 310 F. 3d 1054, 1061 (8th Cir. 2002) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility . . . [o]nly if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.").

10

### B. Opinion Nos. 2, 4, & 5

In his second, fourth, and fifth opinions, Dr. Kress opines about the distance between where the incidents occurred and the approximate distance that Plaintiff would have seen Defendant Griffin [Doc. 41-1 pp. 7, 8]. He further opines that the pull-off area is more conducive to a motorcycle laying over than the roadway, and Plaintiff would not have steered off the roadway into the pull-off area had it not been for Defendant Griffin's actions [*Id.* at 8].

Defendants assert that whether Plaintiff saw Defendant Griffin is a question for the jury and there is no scientific or specialized knowledge, reference to sufficient facts or data, nor reference to reliable principles and methods, outside of Dr. Kress's general opinion, to determine if his opinion was reliably applied to this case [Doc. 41 p. 6; *see also* Doc. 51 pp. 4–5]. Defendants also assert that Dr. Kress did not test the gravel, data related to the tires on the motorcycle, traction of the tires on the road versus the pull-off area, the normal causes of a motorcycle laying over, nor the weight of the motorcycle and operator [*Id.* at 8]. Finally, Defendants assert that Dr. Kress's opinion is not based upon sufficient facts and data and is speculative because he did not know where Defendant Griffin was standing, he did not know where Plaintiff would have first observed Defendant Griffin, or when Plaintiff would have seen Defendant Griffin because he did not know where Plaintiff was looking [*Id.* at 9].

Plaintiff counters that Dr. Kress relies on sources in the record that are commonly relied upon in his fields, including the parties' testimony; his inspection and measurements of the scene, including the road's geometry and curvature; and his experience, knowledge of, and research concerning sight distances, reaction times, and motorcycle operation [Doc. 47 p. 13]. Plaintiff also asserts that Dr. Kress does not make credibility determinations, that Dr. Kress was not required to assume all of Defendant Griffin's statements to be true in forming his opinions, and that Dr. Kress

11

did not pinpoint Defendant Griffin's exact location when Plaintiff saw him does not warrant exclusion [*Id.* at 15–17].

*Analysis.* To the extent Defendants argue that Dr. Kress did not rely upon facts or data or reliable principles and methods in rendering these opinions, Plaintiff points out that Dr. Kress relied upon the following:

1. The Tennessee Electronic Crash Reports;

2. The 911 call audio and emergency call communication reports;

3. The parties' deposition testimony;

4. His inspection of the scene of the collisions (both virtually and in person), including the curvature and geometry of the roadway and paved pull-off area;

5. His observation of other motorcyclists driving around the curves in which the subject events occurred;

6. The 295 photographs he took at the scene;

7. The numerous measurements he took at the scene as documented in his contemporaneous inspection notes;

8. The characteristics of the motorcycle Mr. Sullivan was driving; and

9. Established literature and principles on sight distances, warnings, reaction times, and motorcycle operation (including traction).

[Doc. 47 p. 14 (citing Exh. A at 3–4; Exh. C at 6–7, 62–64)]. Dr. Kress also testified that he was familiar with the area where the incidents occurred, he studied Plaintiff's motorcycle, he has done testing for Harley-Davidson and Kawasaki, he has personal experience riding motorcycles, he has written several articles on motorcycle collisions, and he has personally tested motorcycle tire traction characteristics throughout his career, including the effects of varying surface conditions [*Id.* at 14–15 (citing Exh. C at 47–48, 62–64; Exh. B)]. He considered all of this when opining on "what motorcyclists do and how they respond" and in reaching his understanding about how

12

Plaintiff's incident happened, which included an assessment about what motorcyclists look at on the roadways and how Plaintiff responded to seeing Defendant Griffin [*Id*. (citing Exh. C at 62-65)]. Considering all of this, the Court finds Defendants' arguments not well taken.

The remainder of Defendants' arguments also do not warrant exclusion of Dr. Kress's testimony. Defendants argue that Dr. Kress's opinions are credibility determinations [Doc. 41 pp. 6–9]. While an expert witness may not testify about the credibility of a fact witness, *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999) (holding that expert witness testimony regarding credibility of eyewitness testimony is improper), the Court finds that, as presented in his report, Dr. Kress's opinions are not an assessment of the parties' credibility. Rather, Dr. Kress utilizes the parties' testimony to make factual assumptions supported by the record and he applies those facts to his analysis and examination of the physical evidence and conditions of the roadway where the incidents occurred [*See* Doc. 41-1 pp. 7, 8].

Defendants also argue that Dr. Kress's opinions contradict or do not rely upon Defendant Griffin's testimony. "Expert testimony is not inadmissible simply because it contradicts eyewitness testimony. Expert testimony, however, is inadmissible when the facts upon which the expert bases his testimony contradict the evidence." *Greenwell*, 184 F.3d at 497 (citation omitted)). Defendants have not shown that the facts upon which Dr. Kress bases his opinion contradict the evidence.

Finally, Defendants argue that Dr. Kress's opinions are speculative. Specifically, Defendants assert that Dr. Kress cannot pinpoint exactly where Defendant Griffin was standing when Plaintiff first saw him. As for any uncertainty, "[t]he presence of uncertainty in Dr. [Kress's] analysis does not reduce his report to 'unsupported speculation.'" *Brown v. Norfolk S. Railway Co.*, No. 3:18-cv-205, 2020 WL 4677426, at *5 (E.D. Tenn. May 19, 2020) (citation omitted)).

13

To the extent Defendants challenge the factual basis of Dr. Kress's opinions, they may cross examine Dr. Kress at trial.

### C.     Opinion No. 7

In his seventh opinion, Dr. Kress opines that the collision involving Defendant Pegg and Defendant Griffin standing and gesturing in the curved roadway proximately caused Plaintiff's crash, and if not for Defendants' actions and omissions, Plaintiff more likely than not would have been able to come to a controlled stop in his lane [Doc. 41-1 p. 9]. Defendants take issue with his use of the legal term "proximate cause" and assert that this opinion is based upon Dr. Kress giving more weight to Plaintiff's deposition testimony over Defendant Griffin's testimony [Doc. 41 p. 11]. They assert that allowing this opinion "would cause the jury to surrender its own common sense in weighing the testimony" [*Id.*].

Plaintiff counters that Dr. Kress's opinion is not based upon credibility determinations but upon his "perspective [as] an engineer and accident reconstructionist" [Doc. 47 p. 21]. In reaching this opinion, Plaintiff notes that Dr. Kress reviewed the file, including the parties' deposition testimony, his research and knowledge concerning perception and reaction times, his experience in human factors, and his knowledge and experience concerning the operation of motorcycles [*Id.*]. To the extent that Defendants question whether there is sufficient information in the record to support the testimony, Plaintiff asserts that this goes to weight, not admissibility [*Id.*]. As for his use of the term "proximate cause," Plaintiff argues Dr. Kress does not use the term in the legal sense but as the term is commonly used in engineering, including in human factors and accident reconstruction [*Id.* at 22]. Plaintiff cites the Glossary of Forensics Engineering Practice in support, which defines proximate cause as "a procedural or technical cause of failure that is deemed to be the most significant factor producing a specific effect" [*Id.*]. Defendants, however, assert that this

14

glossary is from ASCE's journal "Failure Mechanisms in Building Construction" [Doc. 51 p. 6], and therefore, inapplicable.

While Court will allow Dr. Kress to discuss whether Plaintiff could come to a controlled stop, as this testimony is not based on credibility determinations but on Dr. Kress's knowledge and experience, the Court will not allow Dr. Kress to testify about proximate causation. Pursuant to Federal Rule of Evidence 704, "An opinion is not objectionable just because it embraces an ultimate issue." But an expert may not render legal conclusions. *United States v. Melcher*, 672 F. App'x 547, 552 (6th Cir. 2016) (explaining that "[a]n expert offers a legal conclusion when he defines the governing legal standard or applies the standard to the facts of the case" (citation omitted)). A legal conclusion is not helpful to the jury because it merely instructs the jury in what verdict to reach. *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997). "Proximate causation" is a "legal term of art[,]" *Bain v. Wells*, 936 S.W.2d 618, 624 (Tenn. 1997), and other courts have excluded similar testimony, *Chipley v. Brownlow*, No. 3:16CV901TSL-RHW, 2019 WL 11093776, at *4 n.5 (S.D. Miss. Apr. 25, 2019) (explaining that the expert "would not be permitted to offer an opinion on proximate causation in any event as that is a legal conclusion and experts are not permitted to give legal conclusions"); *Briley v. Wal-Mart Stores, Inc.*, No. 2:15-CV-439, 2018 WL 276368, at *8 (S.D. Tex. Jan. 3, 2018) (explaining that expert's proposed testimony regarding proximate cause of accident "improperly opines on the legal, not a factual, cause of the accident" (internal quotation marks and citation omitted)).

Yet, Plaintiff argues that "proximation causation" is used in the engineering field. During his deposition, Dr. Kress explained that "proximation causation" involves "'examining the humans and the environment and the vehicles involved' to identify the actions or activities that are primarily, mainly, and/or closely related to something occurring (i.e., the outcome)" [Doc. 47 p.

22 (quoting Exh. C at 100:2–9)].[1]  But Dr. Kress's definition of "proximation causation" is too similar to the legal definition of "proximate cause," which involves consideration of whether conduct was a "substantial factor" in causing the harm. *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991).  Dr. Kress's seventh opinion regarding proximate causation could therefore mislead the jury and it fails to assist it in determining proximate causation. *Jackson v. Parker-Hannifin Corp.*, No. 1:20-CV-370-LG-RPM, 2022 WL 17585278, at *10 (S.D. Miss. Dec. 12, 2022) ("Under the facts of this case, the Court finds that expert opinions about the employer's 'responsibility to prevent' fires could potentially mislead the jury or fail to assist them in determining proximate causation."). Accordingly, the Court **EXCLUDES** Dr. Kress from testifying as to proximate causation.

Rejection of expert testimony is the exception, not the rule. *United States ex rel. TVA v. 1.72 Acres of Land in Tenn.*, 821 F.3d 742, 749 (6th Cir. 2016).  While the Court will exclude Dr. Kress's opinion on proximate causation, the Court declines to exclude his remaining opinions.[2]

---

[1]  Plaintiff also cites to the Glossary of Forensic Engineering Practice, stating that "proximate cause" is defined as "a procedural or a technical cause of failure that is deemed to be the most significant factor in producing a specific effect" [Doc. 47-4 p. 1].  But as Defendants point out, this definition is from a journal titled, "Failure Mechanisms in Building Constructions" [Doc. 51 p. 6 (citing Doc. 47-4 p. 1)]. "Failure Mechanisms in Building Constructions" is not at issue here.

[2]  Although the Court has excluded only Dr. Kress's seventh opinion, whether other testimony is excludable under the Federal Rules of Evidence often depends on the "presentation of the expert's testimony at trial." *United States v. Am. Elec. Power Serv. Corp.*, No. 2:99-CV-1182, 2005 WL 6059298, at *2 (S.D. Ohio July 6, 2005).  To the extent Dr. Kress's testimony at trial either does not conform to the Federal Rules of Evidence or expresses an opinion about proximate cause, Defendants may object at that time.

## IV. CONCLUSION

For the reasons explained above, the Court **GRANTS IN PART AND DENIES** Defendants' Joint Motion to Exclude the Testimony of Tyler Kress [**Doc. 41**]. The Court **EXCLUDES** Dr. Kress from testifying as to proximate causation.

**IT IS SO ORDERED.**

ENTER:

Jill E. McCook
United States Magistrate Judge